**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

NATIONAL UNION FIRE )
INSURANCE COMPANY OF )
PITTSBURGH, PA., )
)
      Plaintiff, )
  v. )
)
REICHHOLD, INC. )
)
    Defendant, Counter-Claimant. )  **MEMORANDUM OPINION**,
--------------------------------------------------)  **ORDER, AND**
JELD-WEN, INC., )  **RECOMMENDATION**
)
     Intervenor Defendant, )     1:06CV939
  v. )
)
GERLING AMERICA INSURANCE )
COMPANY, INDEMNITY )
INSURANCE COMPANY OF )
NORTH AMERICA, WESTCHESTER)
FIRE INSURANCE COMPANY, )
NATIONAL UNION FIRE )
INSURANCE COMPANY OF )
PITTSBURGH, PA., )
)
     Counter-Defendants. )

This declaratory judgment action addresses the obligations of insurers
National Union Fire Insurance Co. of Pittsburgh, Pa. ("National Union"); Gerling
America Insurance Co. ("Gerling"); Indemnity Insurance Co. of North America
("IICNA"); and Westchester Fire Insurance Co. ("Westchester") to indemnify
Defendant/Counterclaimant Reichhold, Inc. ("Reichhold"), in connection with
underlying lawsuits and claims alleging defects in resins that Reichhold produced for

window and door manufacturers. The matter is before the court on the following motions: (1) a motion for summary judgment by the insured Reichhold on Phase I issues (docket no. 276); (2) a motion for summary judgment by insurer Gerling on Phase I issues (docket no. 196); (3) a motion for summary judgment by insurers IICNA and Westchester on Phase I issues (docket no. 197); (4) a motion for oral argument by all parties (docket no. 204); (5) a motion to strike portions of Mark Callicutt's Affidavit by National Union (docket no. 211); (6) National Union's motion to file a supplemental brief in response to Reichhold's motion for protective order (docket no. 219); (7) a motion for summary judgment by Reichhold on Phase II issues (docket no. 221); (8) a motion for summary judgment by Gerling on Phase II issues (docket no. 224); (9) a motion for summary judgment by National Union on Phase II issues (docket no. 227); and (10) a motion for summary judgment by IICNA and Westchester on Phase II issues (docket no. 229). The parties have responded in opposition to the respective motions. The parties have not consented to the jurisdiction of the magistrate judge. Therefore, all dispositive motions must be addressed by recommendation.

For the following reasons, I will grant in part and deny in part the motion to strike portions of the Callicutt Affidavit. Furthermore, I will recommend that the court grant the insurers' Phase I motions for summary judgment. A finding of no coverage in Phase I will render moot all motions for summary judgment regarding Phase II. Furthermore, I will deny the parties' motion for oral argument. Finally, if the court

2

adopts this recommendation, National Union's motion to file a supplemental brief on Reichold's motion for a protective order will be rendered moot.

**FACTS**

On January 16, 2009, the parties filed their Joint Statement of Stipulated Facts. Reichhold submitted additional facts in its motion for summary judgment. National Union contests some of the additional facts submitted by Reichhold. The following facts are taken from the agreed-upon stipulated facts, and the parties' disagreements over additional facts will be noted.

Reichhold, the insured, is a chemical company that formulated and manufactured, among other products, resins for use in making impact-resistant windows and doors. Various insurers provided Reichhold with general liability, umbrella liability, and excess coverage liability insurance. From November 1996 until December 2001, Reichhold manufactured and sold three resins to Nebula Glass International, Inc. d/b/a Glasslam ("Glasslam"), through a distributor, Polygard, Inc. Glasslam then sold the resins to others for use in making impact-resistant, laminated-glass windows and doors, primarily installed in homes and other buildings in Florida and other hurricane-prone areas.

Glasslam initially obtained its resins from a company called Silmar. The Silmar Resin was manufactured using a compound that specifically included Tinuvin 328–a UV absorber. The Silmar Resin was manufactured by using Tinuvin 328 at the very specific level of .2 percent. Windows manufactured with the Silmar Resin

3

conformed with the requirements of Miami-Dade County, Florida, which requires windows sold within the county to pass certain impact and UV-related tests.

Glasslam's laminated glass, marketed as "Safety Plus 1," was made using a patented process Glasslam licensed to window and/or door manufacturers. In that process, the resin and a thin film of polyethylene terephthalate ("PET") are sandwiched between two pieces of glass, with the edges of the PET film anchored to the window frame. The resin is catalyzed and cured, becoming an integrated part of the product. This configuration is intended to allow the product to withstand high-velocity impact from flying objects, as may occur during a hurricane. UV light, which is present in sunlight, causes the PET film and resin to degrade. To prevent degradation, a UV-absorbing compound is added to the resin.

At some point, Glasslam stopped purchasing resin from Silmar and began purchasing it from Reichhold. By contract, Glasslam required Reichhold to provide the following specific resin–Tinuvin 328 at .2 percent. Reichhold sold three resins to Glasslam.[1] None of the resins contained Tinuvin 328 at .2 percent. Rather, some of the resins included Tinuvin at .1 percent, and some lacked Tinuvin altogether, instead containing a different UV absorber called Uvinul.

---

[1] The resins were: (1) Resin 32038 ("Resin 38"), produced from November 13, 1996, to October 22, 2001; (2) Resin 32029 ("Resin 29"), produced from June 26, 1998, to November 8, 2001; and (3) Resin 32038-45 ("Resin 45"), produced from September 17, 2000, to February 7, 2001. Glasslam's final purchase of Reichhold resin was in December 2001, and its final sale to customers was in February 2002.

4

The failure of the Reichhold resins to meet the contract specifications led to third-party product failures, as some products made with the resins changed color, became brittle, exhibited delamination, and lost their essential purpose–the ability to withstand impact.[2] The products made with Reichhold resins cannot be repaired by removing the resin, since it acts as a glue holding the "glass sandwich" together. Since the resin is integrated into the product upon manufacture, and the resin itself was catalyzed and cured, it is neither cost-effective nor possible to repair the finished product. Instead, the window or door must be replaced entirely.[3] In October 2001, Glasslam identified the non-conforming Reichhold resins as the cause of the failures, resulting in numerous lawsuits and claims asserting more than $100 million in damages. The lawsuits include the following:

## A.  *Glasslam I* (Glasslam v. Reichhold, No. 02-607, S.D. Fla.)

Glasslam filed its first suit against Reichhold on April 5, 2002, alleging, among other things, claims for breach of contract and breach of warranty. The Amended Complaint alleged that the absence of Tinuvin 328 at .2 percent in the resins caused the following problems: (1) because there is no UV light blocker, the resin in the laminated glass panels becomes brittle; (2) the absence of the UV light blocker

---

[2] The insurers dispute Reichhold's contention that windows made with the Reichhold resin eventually lose their ability to withstand impact.

[3] The insurers dispute Reichhold's categorization of the final product with the Reichhold resin as "integrated." They further appear to take issue with Reichhold's statement that products containing the defective resin must be replaced entirely.

5

causes the PET film to degrade; (3) the absence of the UV light blocker allows UV light to penetrate the laminated glass panels; (4) the absence of stabilizer allows the resin to set up too quickly; and (5) the absence of stabilizer allows the resin to yellow from exposure to sunlight. Glasslam's claims for breach of contract and express and implied warranties were tried before a jury in May 2004.[4] Glasslam presented expert testimony from Dr. George Frederick Willard, Jr., an organic chemist retained to analyze the resins. Based on his analysis, Dr. Willard testified that the resin Reichhold supplied to Glasslam was "undercooked" and that it contained either too little Tinuvin or a different UV absorber altogether. The *Glasslam I* jury returned a verdict in Glasslam's favor, finding breach of contract and breach of implied and express warranties for Reichhold's failure to provide Tinuvin 328 at .2 percent. On June 28, 2006, the Eleventh Circuit affirmed the judgment. *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203 (11th Cir. 2006).

## B. Post-*Glasslam I* Lawsuits and Claims

After *Glasslam I*, further litigation and claims followed. National Union voluntarily paid, without a reservation of rights, part of the *Glasslam I* judgment. In the current declaratory judgment action, National Union seeks an order from the court finding no coverage for all post-*Glasslam I* lawsuits, which National Union describes as the "underlying lawsuits" in the Second Amended Complaint.

---

[4] Glasslam had also alleged claims for breach of warranty of fitness for a particular purpose and fraud, but the district court dismissed those claims.

1.  *Glasslam II* (Glasslam v. Reichhold, No. 05-60704, S.D. Fla.)

Glasslam filed a second suit against Reichhold on April 29, 2005, seeking more than $64 million in damages for additional building projects not covered in *Glasslam I.* On October 30, 2006, the district court granted partial summary judgment for Glasslam, ruling that the *Glasslam I* jury finding of liability applied, thus imposing collateral estoppel in *Glasslam II.*

2.  *Jeld-Wen I* (Jeld-Wen, Inc. v. Glasslam, No. 05-60860, S.D. Fla.)

Jeld-Wen, Inc., a Glasslam customer, filed a lawsuit against Glasslam on May 26, 2005, alleging damages of more than $40 million. Glasslam filed a third-party complaint against Reichhold. The court again found the liability issue to have been previously resolved. The damages component of the case was tried before a jury in June 2007, resulting in a verdict for Jeld-Wen against Glasslam and for Glasslam against Reichhold. The verdict was mooted when the district court granted Jeld-Wen's motion for a new trial. The *Jeld-Wen I* claims were resolved as part of the settlement of *Jeld-Wen II*, below.

3.  *Jeld-Wen II* (Jeld-Wen v. Glasslam and Reichhold, No. 07-22328, S.D. Fla.)

Jeld-Wen filed a second suit on September 5, 2007. After the grant of a new trial in *Jeld-Wen I*, the court allowed Jeld-Wen to seek damages attributable to 485 homes, including 26,844 units of glass. Trial was set for June 9, 2008. On June 5, 2008, the court ruled on summary judgment that the issue of breaches of contract and warranty could not be relitigated and that claims by Jeld-Wen for "historical

7

repairs," out-of-warranty repairs, lost profits, and consequential damages could all be pursued against Reichhold. The Jeld-Wen cases subsequently settled in June 2008.

4.  Jones and Opt-Outs (*Jones v. Jeld-Wen*)

The *Jones* suit, a putative class action, was filed against Jeld-Wen on August 14, 2007, in Florida state court, and removed to the Southern District of Florida on September 5, 2007. Jeld-Wen filed third-party complaints against Glasslam and Reichhold. Some Jeld-Wen customers opted out of the class and filed individual lawsuits. The court denied class certification in May 2008.

5.  Other Third-Party Claims

Several other claims have been made against Reichhold without lawsuits being filed, including the following: (1) *China*–claiming damages due to products made with Reichhold resin used in buildings in Hong Kong and China; (2) *Boca Raton*–for products in hotels in Boca Raton, Florida; (3) *Bahamas*–claiming damages for products made by Grand Bahamas Window Company and SunTec using Reichhold resin; (4) *Dependable Glass/Omni Storage*–seeking damages for products containing Reichhold resin made by Dependable Glass and installed at the Omni Storage Facility in Louisiana; and (5) *Sokoloff*–damages for windows and doors containing Reichhold resin in a home in Florida, settled as part of the Jeld-Wen settlement.

**ISSUES PRESENTED**

The parties have agreed to litigate this matter in two phases: Phase I for scope of coverage issues and Phase II for limits of coverage issues. This matter is before the court on the parties' various motions for summary judgment on both Phase I and Phase II issues. The court first addresses the parties' respective motions for summary judgment as to Phase I issues. If there is no coverage determined in Phase I, then the court need not address the summary judgment motions related to Phase II issues.

National Union filed this declaratory judgment action seeking a determination of no coverage owed under its umbrella policies on the basis that Reichhold's defective resins do not constitute an "occurrence" within the meaning of the applicable polices.[5] Alternatively, National Union seeks a declaration that its coverage obligations are limited to windows actually exhibiting signs of "property damage," if any "property damage" even occurred within the policies' meaning, during the National Union policy periods. Finally, National Union contends that even if the court finds that the defective resins constitute "occurrences" resulting in "property damage," various exclusions bar or limit coverage, including the following: the Expected or Intended Exclusion, the Your Product Exclusion, the Impaired Property Exclusion, the Contractual Liability Exclusion, and the Product Recall

---

[5] The commercial general liability policy was issued by Zurich Insurance Co., which is not a party to this action.

Exclusion. The other insurers, who all provide excess coverage and whose policies follow form to the National Union policies, join in National Union's arguments regarding coverage. The excess insurers also raise additional, separate arguments in their summary judgment motions, such as whether Reichhold timely notified them of claims in the underlying lawsuits.

National Union's Motion to Strike Portions of the Callicutt Affidavit

Before addressing the substance of the summary judgment motions, the court must first address the motion by National Union, pursuant to Federal Rule of Civil Procedure 56(e)(1), Middle District of North Carolina Local Rule 56.1(d), and Federal Rule of Evidence 602, to strike paragraphs 10-17, 20-23, 30, 32, 34-35, 37-38, 42-44, 47-48, 50, 53-56, 62, and 64-67 of an affidavit submitted by Reichhold employee Mark Callicutt. Reichhold submitted the affidavit in support of its motion for summary judgment. (*See* Ex. to Docket no. 194.) As noted, one of the issues before the court on summary judgment is whether the defective resin manufactured by Reichhold constituted an "occurrence" within the meaning of the policies. Reichhold submitted the Callicutt Affidavit in part to show that Reichhold took great care in testing and manufacturing its resins and therefore did not have an expectation of damages when it failed to use contractually required UV absorber in the resin it sold to Glasslam. In support of the motion to strike, National Union contends that the affidavit is irrelevant because a jury has already found Reichhold liable for its knowing failure to supply resin that comported with Glasslam's specifications. National Union

10

contends that this court should infer an expectation of damages because property damage was substantially certain to occur as a result of Reichhold's breach of contract and that the Callicutt Affidavit therefore offers no information that may assist this court's determination with respect to the "occurrence" issue.

National Union further contends that the Callicutt Affidavit suffers from additional deficiencies, including that the affidavit contains statements not within Callicutt's personal knowledge; the affidavit contains statements that would not be admissible in evidence; or the affidavit contains conclusory statements, self-serving opinions, or opinions of a fact witness without corroborating evidence. National Union further contends that certain statements in the Callicutt Affidavit are contrary to prior judicial determinations. National Union notes that the Eleventh Circuit affirmed the *Glasslam I* jury verdict against Reichhold. The jury in *Glasslam I* found Reichhold liable for breach of contract, breach of express warranty, and breach of implied warranty. The jury also rejected Reichhold's defense that Glasslam should be equitably estopped from recovering against Reichhold on the ground that Glasslam tested and approved a sample of the Reichhold resin before purchasing it from Reichhold. National Union contends that, as a result of the *Glasslam I* jury finding and final judgment, Reichhold should now be estopped from arguing or asserting any facts contrary to the jury's verdict, including that the contract did not require the use of Tinuvin 328 at .2 percent or that Glasslam's alleged approval of the resin bars liability for Reichhold's breaches.

11

I will grant the motion to strike in part and deny the motion in part for the following reasons. First, to the extent that some of the statements in the Callicutt Affidavit are contrary to prior determinations, are irrelevant, or are not supported by testimony in this case, I will disregard those statements in addressing the summary judgment motions. For instance, I will disregard all statements in the Callicutt Affidavit offered to support Reichhold's estoppel argument and all statements used to contradict the prior jury finding that the contract between Reichhold and Glasslam required Reichhold to use Tinuvin 328 at .2 percent and that Reichhold breached that contract. That is, I will not consider any facts in the Callicutt Affidavit used to relitigate the underlying liability issue. Furthermore, to the extent that Reichhold is attempting to introduce evidence to show that damage was not intended and that the damage was "accidental," that evidence is irrelevant and will be disregarded for the reasons stated *infra*.[6]

I will not, however, disregard statements in the Callicutt Affidavit based on National Union's contention that Callicutt lacks personal knowledge. Federal Rule of Civil Procedure 56(e)(1) requires statements in an affidavit filed in support of a motion for summary judgment to be based on personal knowledge. Moreover, Federal Rule of Evidence 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has

---

[6] That is, as the court discusses *infra*, the fact that Reichhold may have carefully tested its resins and did not subjectively intend for the damage to occur does not alter the court's conclusion that there was no "occurrence" within the meaning of the policies.

12

personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony." FED. R. EVID. 602. Reichhold appears to concede that Callicutt does not have personal knowledge of all matters to which he has attested in his affidavit. Nevertheless, Callicutt was previously designated as Reichhold's Rule 30(b)(6) deposition witness on topics such as the resins at issue in the underlying cases, including the formulation, testing, development, and physical properties of the resins; Reichhold's knowledge and testing of the Silmar resin; Reichhold's knowledge and analysis of Tinuvin and Uvinul; Reichhold's decision to use another UV absorber other than Tinuvin 328 at .2 percent; and quantities of the resins manufactured and sold. As the Rule 30(b)(6) designee, Callicutt was charged with reviewing Reichhold's corporate documents, and he therefore familiarized himself with the facts attested to in his affidavit. Therefore, the court will not strike the statements in the affidavit purportedly not based on Callicutt's personal knowledge. *See Hijeck v Menlo Logistics, Inc.*, Civil Action No. 3:07-CV-0530-G, 2008 WL 465274, at *4 (N.D. Tex. Feb. 21, 2008) (where plaintiff argued that an affidavit was not based on personal knowledge, noting that the affiant had been designated as a Rule 30(b)(6) deposition witness and stating that "it is not necessary that [the affiant] have direct, personal knowledge of each and every fact discussed in her affidavit or her deposition"). *But see Apparel Bus. Sys., LLC v. Tom James Co.*, Civil Action No. 06-1092, 2008 WL 858754, at *21 (E.D. Pa. Mar. 28, 2008) (evaluating a witness affidavit on summary judgment

13

according to "the personal knowledge requirement of Rule 56(e)," despite that the affiant had earlier testified in a deposition as a Rule 30(b)(6) witness).

Along the same lines, the court will not strike various paragraphs referring to records that were allegedly not introduced into evidence. Here, Reichhold has adequately shown that it has made relevant records available to the insurers for review, and as the Rule 30(b)(6) designee Callicutt was entitled to study and rely on Reichhold's corporate records in preparing his testimony. For the reasons stated above, I will deny in part and grant in part National Union's motion to strike portions of the Callicutt Affidavit, I will only consider portions of the affidavit in addressing the summary judgment motions, and consideration of those portions will be reflected in the ensuing analysis.

**STANDARD OF REVIEW**

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless

14

there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

## PHASE I–LIABILITY ISSUES

<u>Whether Reichhold's Formulation and Manufacture of Defective Resins Constituted Covered "Occurrences" under North Carolina Law</u>

In support of its motion for summary judgment, Reichhold first contends that the failure of its resins in this case constituted an "occurrence" within the meaning of the policies at issue. Reichhold also contends that the defective resins resulted in "property damage" within the meaning of the policies. The insurers all contend, among other things, that the failure of the resins did not constitute "occurrences" within the meaning of the policies and, furthermore, the defective resins did not result in "property damage" within the meaning of the policies.

15

Under North Carolina law, the construction of insurance policy provisions is a matter of law to be determined by the court.[7]  *See Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970).  As with all other contracts, the goal in construing an insurance policy is to effectuate the intent of the parties when the policy was issued.  *Id.*  If a policy defines a term, that definition must be used, but where no definition is given words are to be given their plain meaning.  *Id.*  Because the insurance company drafts the policy terms, any ambiguity must be resolved in favor of the policyholder.  *Id.*   Finally, the burden is on the insured to show that coverage exists for the claimed loss.  *Nationwide Mut. Ins. Co. v. McAbee*, 268 N.C. 326, 328, 150 S.E.2d 496, 497 (1966).  If, however, the insurer relies on a clause that excludes coverage, the burden is on the insurer to establish the exclusion.  *Id.*

The insuring language of the policies at issue covers liability for "property damage" caused by an "occurrence."   The policies define "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the Insured."  The policies do not define the term "accident," but the parties agree that North Carolina law provides the definition: "an unforeseen event, occurring without the will or design of the person whose mere act causes it; an unexpected, unusual,

---

[7]  Here, the parties appear to agree that North Carolina law applies to the insurance policies at issue because North Carolina is the state in which the policies were issued.  *See Fortune Ins. Co. v. Owen*, 351 N.C. 424, 428, 526 S.E.2d 463, 466 (2000).

16

or undesigned occurrence; the effect of an unknown cause, or, the cause being known, an unprecedented consequence of it; a casualty." *ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 472 F.3d 99, 120 (4th Cir. 2006) (quoting *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 694, 340 S.E.2d 374, 379 (1986)). The policies define "property damage" in relevant part as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured."

In support of its argument that the defective resins constituted "occurrences" resulting in "property damage," Reichhold first relies on the Fourth Circuit's decision in *ABT Building Products Corp. v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, 472 F.3d at 120. In *ABT*, homeowners sued a hardboard siding manufacturer, alleging that the siding was defective because it absorbed moisture and prematurely deteriorated. *Id.* at 104. Many of the plaintiffs also alleged that problems with the defective siding resulted in consequential damage to their homes. *Id.* The insurance policies in *ABT* contained identical language regarding "occurrences" as the policies here, and the district court held that the claimed damages resulted from an "occurrence" within the meaning of the policies. *See id.* at 120.

On appeal, National Union argued that the district court erred in concluding that the claimed damages resulted from an "occurrence" within the meaning of the policies. National Union contended that the consequences of ABT's manufacture of defective siding were foreseeable, and that the deterioration of the siding was not

17

an accident, but rather the expected result of ABT's "shoddy workmanship." *Id.* In arguing as much, National Union relied on *Wm. C. Vick Construction Co. v. Pennsylvania National Mutual Casualty Insurance Co.*, 52 F. Supp. 2d 569 (E.D.N.C. 1999), in which the Eastern District of North Carolina held that faulty workmanship did not constitute a covered "occurrence." *Id.* at 586. In *Vick,* the insured construction company entered into a construction contract for an addition to an office building. *Id.* at 572. A subcontractor improperly applied a waterproofing membrane and failed to apply fiberglass matting to a stucco-clad building, resulting in water damage and cracked building walls. *Id.* at 572-73, 579. In subsequent arbitration, the other contracting party alleged breach of contract and breach of warranty of workmanship against the construction company. *Id.* at 579. The Eastern District of North Carolina subsequently granted a motion for summary judgment by the construction company's insurer on the issue of whether an insurance policy provided coverage for the damage and whether the insurer breached its duty to defend the company. The court applied North Carolina law and held, among other things, that the consequences of the defective workmanship did not constitute an "occurrence" within the meaning of the policies. *See id.* at 584-86 ("[I]t is clear that [the] claims against [the insured] were based solely on the costs of repairing [the insured's] allegedly faulty workmanship, and thus, there was no 'occurrence' within the meaning of the policies."). In an unpublished opinion, the Fourth Circuit affirmed

*Vick* and expressly adopted the reasoning set forth in the district court opinion. 213 F.3d 634 (4th Cir. 2000) (per curiam).

The Fourth Circuit in *ABT* found that *Vick* did not apply because it was ABT's defective *product*, not ABT's faulty *workmanship*, that caused the damages. *ABT*, 472 F.3d at 120. The court also noted that the North Carolina Supreme Court in *Iowa Mutual Insurance Co. v. Fred Simmons Co.* had "rejected the view that an act of negligence, like ABT's manufacture of defective siding, cannot constitute an 'accident' under a liability policy when the resulting damage takes place without the insured's actual foresight or expectation." *Id.* at 120-21 (citing *Simmons*, 258 N.C. 69, 79, 128 S.E.2d 19, 25-26 (1962)). The *ABT* court observed:

> "[T]o adopt the narrow view that the term 'accident' in liability policies of insurance . . . necessarily excludes negligence would mean that in most, if not all, cases the insurer would be free of coverage and the policy would be rendered meaningless." [quoting *Simmons*] In a post-*Simmons* decision, the North Carolina Court of Appeals observed that courts must look to "whether the damage was expected or intended" in determining whether an event constitutes an "occurrence." *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374, 380 (1986). The court emphasized that "[w]hether events are 'accidental' and constitute an 'occurrence' depends on whether they were expected or intended *from the point of view of the insured.*" *Id.* (emphasis added). In other words, the issue is not whether an insured should have foreseen the consequences of its conduct, but whether it in fact foresaw or intended the resulting damages.

*Id.* at 121. The Fourth Circuit concluded that there was no evidence that ABT expected or intended the homes to suffer damages from the defective siding. *Id.* at 121. The Fourth Circuit therefore sustained the district court's finding that the

19

damages suffered were the result of an accident, and thus constituted an "occurrence" under the policies. *Id.*

Reichhold also contends that National Union argued and lost the same arguments it makes here regarding "occurrence" and "property damage" in *National Union Fire Insurance Co. of Pittsburgh, Pennsylvania v. Puget Plastics Corp.*, 532 F.3d 398 (5th Cir. 2008). In *Puget Plastics*, Microtherm manufactured water heaters, a primary component of which was supplied by Puget. *Id.* at 400. Puget "knowingly flouted" recommended temperature guidelines, resulting in defective components, in turn resulting in ruptures in the water heaters and water damage to the circuitry of the water heaters, as well as to end-users' homes and businesses. *Id.* More specifically, Puget knowingly molded the water chambers using a lower melt temperature than that recommended, and then attempted to compensate by raising the mold temperature. *Id.* at 402.

A jury awarded Microtherm more than $22 million against Puget. *Id.* Puget's umbrella insurer, National Union, denied coverage. *Id.* The policy defined the term "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the Insured." *Id.* at 400-01. National Union argued that Puget's actions could not constitute an occurrence because the jury found that Puget had knowingly violated the Texas Deceptive Trade Practices Act and its

20

actions were therefore intentional. The district court rejected that argument and the Fifth Circuit affirmed that part of the district court's holding on appeal. *Id.* at 402.

Finally, Reichhold also cites to *Travelers Indemnity Co. v. Miller Building Corp.* to support its argument that Reichhold's breach of contract in this case constituted an "occurrence" within the meaning of the policies at issue. 97 F. App'x 431 (4th Cir. 2004) (unpublished). In *Miller Building*, an insurer sought an order that it had no duty to defend an insured in an arbitration proceeding involving a third-party's claims that the policy holder's alleged shoddy workmanship in constructing a hotel caused damage to guest-room carpets in the hotel. *Id.* at 433. Like the policies here, the policies in *Miller Building* stated that the insured would provide coverage for property damage caused by an occurrence. *Id.* The policies defined occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 435. The policy defined property damage as "physical injury to tangible property, including all resulting loss of use of that property . . . [and] [l]oss of use of tangible property that is not physically injured." *Id.* at 433. The district court determined that the hotel had never been in an "undamaged" condition and therefore the claims did not fall within the scope of the policy–i.e., the claims were not for property damage, but were instead for defective construction. *Id.* at 434.

In an unpublished opinion with one judge dissenting, the Fourth Circuit reversed, holding that the insurer had a duty to defend the insured against the third-

party's claims.[8]  *Id.*  The court recognized that under North Carolina law liability insurance is not a substitute for a performance bond and found that, to the extent the third party was trying to recover from the insured for mere faulty workmanship, the claims did not fall within the meaning of the policies because faulty workmanship does not constitute "property damage."  *Id.*  The court, nevertheless, found that, in addition to the claims seeking to repair the insured's faulty workmanship, the third-party's counterclaim also alleged that carpet in certain guest rooms was damaged by water leaking through the improperly installed windows and sliding glass doors.  *Id.* at 434-36.  The court found that this damage constituted the policy's definition of "property damage."  *Id.*  The court rejected the insured's argument that the hotel was never in a non-defective condition; instead, the court found that the carpet was delivered undamaged and was therefore separate from the hotel.  *Id.*  The court concluded that, at minimum, the third-party's claims with regard to damage to the guest-room carpet sufficiently alleged the existence of property damage within the meaning of the policy.

In reaching its conclusion, the Fourth Circuit stated that North Carolina law applies a test of subjective intent in determining whether an accident occurred for the

---

[8]  Notably, in the dissenting opinion Judge Wilkinson cautioned that the Fourth Circuit's holding essentially transformed the insurance policy at issue into a performance bond because it allowed coverage for what was really the direct consequence of the insured's defective workmanship.  *Id.* at 438 (Wilkinson, J., dissenting) ("Finding that 'property damage' has occurred here effectively transforms a commercial general liability insurance policy into a performance bond.  Neither party contracted into such an arrangement, and Miller Building Corporation may now receive a windfall for a very poor job of construction.").

22

purpose of insurance coverage–that is, the court asks whether the insured subjectively expected the resulting damage. *See id.* at 436 (citing *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 72 N.C. App. 80, 323 S.E.2d 726 (1984)). The court found that the third-party's claim of damage to guest-room carpet caused by the insured's improper installation of windows and sliding glass doors fell within the scope of the policy because "there is nothing in the record indicating that [the insured] subjectively intended to cause damage to the guest rooms. Thus, [the third party's] claim that [the insured's] allegedly shoddy workmanship caused damage to the guest-room carpets sufficiently alleges an 'occurrence' within the meaning of the policy." *Id.* at 437. The court concluded that the insurer therefore had a duty to defend the insured against the third-party's claims.

Reichhold contends that, just as in *ABT, Puget Plastics*, and *Miller Building*, there is no evidence that Reichold–given the care with which it formulated and tested its products–expected or intended to damage the windows and doors into which the resins were integrated. In sum, Reichhold contends that National Union's contention that damage to the windows and doors upon integration of the defective resin was a foreseeable result is exactly the interpretation that North Carolina state courts and federal courts have rejected because to interpret the policy in such a manner would render it meaningless.

I find that the cases upon which Reichhold relies are distinguishable and do not compel a finding of coverage in this case. First, the claims against Reichhold in

the underlying lawsuits in this case did not allege damages to property separate from the windows in which the resin was placed, nor are the claims based in negligence.[9] More specifically, I find that the facts in *ABT* are distinguishable from the facts in this case. As National Union notes, this case involves an intentional deviation from express contract specifications in product design and manufacture, whereas the *ABT* court specifically recognized ABT's manufacture of defective siding as "an act of negligence," 472 F.3d at 120. Here, however, there was no act of negligence; rather, this case sounds in pure contract, as evidenced by the jury's verdict in *Glasslam I*. Therefore, *ABT* is simply not controlling in this case. Indeed, the facts from *Vick*, discussed *supra*, are more properly aligned with the facts here. As in this case, *Vick* involved claims arising from breach of contract and breach of warranty. As noted, the court in *Vick* found that the breaches in that case did not constitute "occurrences" within the meaning of the insurance policies. In its analysis, the *Vick* court specifically relied on *Jakobson Shipyard, Inc. v. Aetna Casualty & Surety Co.*, where the Second Circuit held that construing the word "accident" as encompassing damage to a product resulting from failure to perform to contract specifications would result in an unacceptable expansion of the agreed-upon coverage. 961 F.2d 387, 389 (2d Cir. 1992). In *Jakobson*, in an underlying suit, a plaintiff sued the insured for breach of contract and breach of warranty regarding defective steering

_____

[9] Moreover, this court is not required to rely on *Miller Building* as precedent since it is an unpublished opinion.

mechanisms in tugboats. *Id.* The complaint alleged that the insured's work product did not perform according to contract specifications because the insured failed to manufacture the steering mechanisms in a workmanlike manner. *Id.* The plaintiff alleged that the poor workmanship resulted in damage to the tugs themselves, but the plaintiff did not allege any damages to the property or persons of third parties. *Id.* In a subsequent declaratory judgment action over insurance coverage, the *Jakobson* court observed:

> Were we to construe the words "accident" or "continuous or repeated exposure to conditions" as encompassing damage to a product resulting from the product's failure to perform according to contract specifications, we would expand the agreed-upon coverage. An accident, given its dictionary meaning, is "an event or condition occurring by chance or arising from unknown or remote causes." *Webster's Third New International Dictionary* 11 (1981). We might add that in common parlance an external force of some kind is usually involved. *However, the faulty steering on the tugboats sold to Express was the result of faulty workmanship that did not comply with the specifications of the contract and Express's action sounded in contract.* There was no chance occurrence, no unknown or remote cause, and no unexpected external force.

*Id.* (emphasis added).

Here, the facts of this case are simply more closely aligned with the facts in *Vick* and *Jakobson* than with the facts in *ABT*. Similar to *Vick* and *Jakobson*, (1) the underlying claims in this case arise out of contract; (2) the damage alleged is damage to the windows on which the defective resin was applied; and (3) there was no "external force" causing the claimed damage–rather, the damage was caused solely by Reichhold's failure to meet contractual specifications.

25

Reichhold's reliance on *Puget Plastics* is also misplaced. There, the Fifth Circuit Court of Appeals found a "genuine issue of material fact as to whether [the insured] expected the chambers to rupture, or whether the ruptures were highly probable." 532 F.3d at 402. Therefore, National Union did not, as Reichhold suggests, lose the argument regarding "occurrence." Furthermore, the facts in this case are different from those in *Puget Plastics* in that, here, there was no "recommended" UV absorber. To the contrary, Tinuvin 328 at .2 percent was specifically *required* by contract, Reichhold breached the contract, and a jury specifically found that Reichhold did not meet express contract specifications. In sum, the Fifth Circuit's ruling against National Union in *Puget Plastics* does not require a finding of coverage in this case.

Although Reichhold attempts to frame the damage in this case as the result of "negligence," this is simply not a negligence case. In other words, if Reichhold had submitted the resin as specified by Glasslam (i.e., Tinuvin 328 at .2 percent), and if the resin had subsequently failed because it was "undercooked" as a result of negligence by Reichhold in the manufacturing process, then perhaps this case would be more aligned with *ABT* and other cases cited by Reichhold.[10] Although it is true that in *Glasslam I* an expert testified that the resin was in part defective because it was "undercooked," the fact remains that the jury found that Reichhold breached its

---

[10] In other words, as the insurers note, this is not a case where, for example, a Reichhold employee mistakenly used only one-half of the required Tinuvin or mistakenly selected the incorrect UV absorber from a supply shelf. (*See* National Union Br., p. 19, docket no. 192.)

contract with Glasslam to provide Tinuvin 328 at .2 percent and that Glasslam was damaged as a result of that breach, and the parties may not now relitigate the issues of liability that have already been resolved. *See Iowa Mut. Ins. Co. v. Fred M. Simmons, Inc.*, 262 N.C. 691, 695, 138 S.E.2d 512, 515 (1964) (stating that an "[i]nsured's liability to [the insured] based on negligence in performing the contract cannot be relitigated").

Reichhold insists that this court must apply a subjective test and ask merely whether Reichhold *subjectively intended* the damage that resulted from its breach. Reichhold relies on a quotation from *Davis v. DiBartolo* in which the North Carolina Court of Appeals stated that the test for whether damage was intended is "a subjective one, from the standpoint of the insured, and not an objective one asking whether the insured 'should have' expected the resulting damage." 176 N.C. App. 142, 147 625 S.E.2d 877, 881 (2006) (quoting *McKoy v. Coker*, 174 N.C. App. 311, 316, 620 S.E.2d 691, 695 (2005)). Although in some cases the North Carolina courts have considered whether the insured subjectively intended the damage in addressing whether an event constitutes an "occurrence" or "accident," those cases involved acts of negligence, not pure breach of contract, or an otherwise intentional act as in this case.[11] Indeed, the North Carolina courts have held that an *intentional* act such as breach of contract is excluded under a liability policy if the act is (1)

_____

[11] For instance, *Davis* involved allegations that a negligent inspection caused a deep fat fryer to topple and injure a restaurant worker. *See id.* at 143, 625 S.E.2d at 879.

intended to cause injury or damage *or* (2) is substantially certain to cause injury or damage. *See Henderson v. U.S. Fid. & Guar. Co.*, 124 N.C. App. 103, 111, 476 S.E.2d 459, 464 (1996) (affirming summary judgment for an insurer where a real estate agent's misrepresentation as to a flood plain was "substantially certain" to cause injury to homeowners who were damaged by a flood), *aff'd*, 346 N.C. 741, 488 S.E.2d 234 (1997); *Holz-Her U.S., Inc. v. U.S. Fid. & Guar. Co.*, 141 N.C. App. 127, 131, 539 S.E.2d 348, 351 (2000) (affirming summary judgment for an insurer on a duty to defend issue affirmed where injury was substantially certain to result from alleged misrepresentations).

Applying Reichhold's proposed "subjective intent" test to determine whether an event constitutes an "occurrence" in pure breach of contract cases simply does not comport with well-established North Carolina law regarding the intended scope of insurance policies. That is, North Carolina cases make clear that insurance policies are *not* to be used as performance bonds. *See, e.g., Western World Ins. Co. v. Carrington*, 90 N.C. App. 520, 369 S.E.2d 128 (1988). As the North Carolina Court of Appeals stated in *Carrington*:

> Since the quality of the insured's work is a "business risk" which is solely within his own control, liability insurance generally does not provide coverage for claims arising out of the failure of the insured's product or work to meet the quality or specifications for which the insured may be liable as a matter of contract . . . . [L]iability insurance policies are not intended to be performance bonds.

*Id.* at 523, 369 S.E.2d at 130; *see also Barbee v. Hartford Mut. Ins. Co.*, 330 N.C. 100, 103, 408 S.E.2d 840, 842 (1991) (recognizing the principle that insurance

28

policies do not cover faulty workmanship and "are not intended to be performance bonds"); *Hobson Constr. Co. v. Great Am. Ins. Co.*, 71 N.C. App. 586, 591, 322 S.E.2d 632, 635 (1984) (holding that a policy definition of "property damage" did not encompass damages for the cost to complete or repair improper workmanship); *Wayne Bros., Inc. v. N. River Ins. Co.*, No. 1:01cv00842, 2003 WL 22213615, at *6 (M.D.N.C. Aug. 20, 2003) (noting that the "law in North Carolina is clear that the costs of repair and completion of an insured's own faulty workmanship is a foreseeable risk that is properly remedied by a performance bond rather than a [commercial general liability] policy"). If coverage is found in pure breach of contract cases such as this one, then parties to a contract will have an incentive to flout the contractual specifications, knowing that damages resulting from an intentional breach will always be covered by insurance. In other words, every insurance policy in North Carolina will be transformed into a performance bond, a result not supported under North Carolina law.

I further agree with the insurers that an expectation of damages should be inferred from the jury findings and verdict in *Glasslam I*. That is, the jury in *Glasslam I* determined that Reichhold ignored the contract specifications as to both amount and type of UV absorber, despite Reichhold's knowledge that the resin would be used in laminated, hurricane-resistant glass and, thus, exposed to UV light. Instead, Reichhold chose to use Uvinul, the UV absorber it kept on hand, which was less expensive than Tinuvin 328 in the specified amount. Furthermore, when directly

29

asked by Glasslam whether it was using Tinuvin 328 at .2 percent in its resin, Reichhold falsely represented that it was. Reichhold employee Matt Brandli testified that, given Glasslam's insistence upon Tinuvin, he would have felt compelled to advise Reichhold if he knew that Tinuvin was not in the resin. Even after test results indicated that Reichhold was not using Tinuvin 328 at .2 percent, Reichhold refused to disclose the chemical composition of the resin to Glasslam. Based on these undisputed facts, the court should find that Reichhold should have reasonably anticipated significant problems with the Safety Plus 1 glass and infer intent.[12] *Accord Wm. C. Vick Constr.*, 52 F. Supp. 2d at 584; *see also N. River Ins. Co. v. Marietta Drapery & Window Coverings Co.*, No. 06-CV-517, 2008 WL 2959930, at *4 (S.D. Ill. July 31, 2008) (stating that although the failure of a product to perform as warranted may be unintentional, "it cannot be considered an 'accident' within the meaning of policy because the natural and ordinary consequences of an act do not constitute an accident"); *see also Bloomer Plastics, Inc. v. Fireman's Fund Ins. Co.*, No. 06-C-124-S, 2006 WL 1666303, at *7 (W.D. Wis. June 13, 2006) (where the insured was alleged to have intentionally changed its manufacturing processes, resulting in a failure to meet contractual product specifications, "[s]uch an intentional act remove[d] [the] allegations from coverage as an occurrence under [the applicable policy]," even though the insured "did not expect, desire or anticipate that its film

---

[12] Most of the facts noted here have already been adjudicated and are set forth in the Eleventh Circuit's opinion affirming the jury verdict in *Glasslam I*. See *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203 (11th Cir. 2006). The remaining facts are either stated in the parties' Stipulated Facts or are supported in the record.

30

would develop cracks and pinholes"); *Drew Chem. Corp. v. Fid. & Cas. Co. of N.Y.*, 413 N.Y.S.2d 538 (1976), *aff'd*, 387 N.E.2d 226 (1979) (where the insured intentionally changed the formula for a chemical food additive for peanut butter resulting in separation of the peanut butter, there was no "occurrence" within the meaning of the insurance policy, even though the insured did not anticipate the separation of the peanut butter).

In sum, for the reasons stated herein, I find that Reichhold's breach of its contract with Glasslam did not constitute an "occurrence" within the meaning of the policies; therefore, the insurers are not required to provide coverage for the damage resulting from Reichhold's breach. Since there is no "occurrence" within the meaning of the policies, the court does not need to determine whether "property damage" resulted as a result of the breach.[13]

## II. Whether National Union Waived its Right to Contest Coverage by Bonding and Paying the *Glasslam I* Judgment

Here, it is undisputed that National Union did not issue a reservation of rights before the judgment was entered against Reichhold in *Glasslam I*, and National Union subsequently issued payment as part of the resulting settlement of

---

[13] As noted, the insurers further contend that various exclusions in the policies bar coverage. Because there is no "occurrence," and thus no coverage in the first instance, there is no need to determine whether any of these exclusions bar coverage. Furthermore, there is no need to address additional arguments on summary judgment by the various excess insurers, such as whether Reichhold timely notified them of the claims in the underlying lawsuits.

31

*Glasslam I.* The parties appear to agree that Reichhold properly notified National Union of the *Glasslam I* claims in 2002, but for some reason National Union did not open a claim file until May 2004, after the *Glasslam I* verdict was entered. The parties also appear to agree that National Union did not open the claim file in *Glasslam I* until after the verdict because National Union's claims department somehow lost Reichhold's notice.

The *Glasslam I* verdict was rendered on May 21, 2004, and judgment was entered on that verdict the same day. Reichhold thereafter demanded that National Union bond the judgment for appeal. On June 18, 2004, contemporaneously with agreeing to post an appellate bond for the *Glasslam I* verdict, National Union issued a letter to Reichhold specifically reserving National Union's right to contest coverage in connection with claims not at issue in *Glasslam I* and for any liability arising out of any subsequent lawsuits.[14] After sending the June 18 letter, and upon receipt of

---

[14] The letter provides, in relevant part:

In order to protect the apparently critical interests of Reichhold, and in light of Zurich's decision to pay the costs of a bond only up to the amount of $4 million, which is far less than the judgment, AIGTS, on behalf of National Union, has secured a bond covering the full amount of the underlying judgment . . . . In addition, this decision should in no way be taken as an indication that National Union believes future claims not part of the [*Glasslam I*] Lawsuit but related to Reichhold's resins are covered by the National Union Umbrella Policies or that National Union has any responsibility to provide coverage for claims and/or damages that may be eliminated or remitted from the underlying judgment by way of appeal and/or retrial. National Union reserves its right to contest coverage for any claims or damages that are not part of a final judgment after appeal and/or retrial of the [*Glasslam I*] lawsuit.

notice of additional claims, National Union investigated those claims, issued additional reservation of rights letters, and filed this lawsuit to contest coverage on October 27, 2006, before National Union's contribution to the settlement of any of the underlying lawsuits and claims.

Reichhold contends that by failing to open a claim file and conduct a proper investigation in *Glasslam I* and by agreeing to bond the judgment on appeal, National Union has waived its right to assert coverage defenses arising out of the same occurrences as those addressed in *Glasslam I*. I do not agree. Contrary to Reichhold's contention in its brief, National Union properly issued a timely reservation of rights as to all post-*Glasslam I* claims. As National Union notes, Reichhold does not cite a single North Carolina case where an insurer was found to have waived coverage where the insurer posted an appellate bond in a lawsuit, specifically reserved its rights to deny coverage for later lawsuits, issued reservation of rights letters in connection with each claim, and filed a declaratory judgment action to contest coverage for the subsequent lawsuits. Moreover, courts in other jurisdictions have recognized that the fact that an insurer pays a claim in one lawsuit does not mean that the insurer waives the right to contest liability as to subsequent, related lawsuits, even if the insurer had knowledge of facts clearly showing a claim of non-coverage in the first lawsuit. *See Am. Int'l Specialty Lines Ins. Co. v. Canal*

(SF ¶ 171, Ex. 25.) National Union also set forth in the June 18 letter specific grounds that would potentially limit or preclude any further coverage obligation.

*Indem. Co.*, 352 F.3d 254, 269 (5th Cir. 2003) (stating that an insurer did not waive its right to contest liability for pollution-related damages and claims expenses arising out of a diesel truck accident, where the insurer had paid a co-insurer a pro rata share, under the same policy, of damages and expenses arising out of a similar, earlier accident); *see also Atl. Mut. Ins. Cos. v. Lotz*, 384 F. Supp. 2d 1292, 1301 (E.D. Wis. 2005) (holding that an insurer did not waive defenses to subsequent claims by the insured by paying for damage from a one-time plumbing leak). For all these reasons, the court should find that National Union has not waived its right to contest coverage for all post-*Glasslam I* lawsuits and claims.

III. Whether Collateral Estoppel Bars National Union from Asserting that there Was No "Property Damage" or "Occurrence" under the Policies

Finally, Reichhold contends that National Union should be estopped from asserting that there was no "property damage" or "occurrence" in this case, because in *ABT* National Union litigated and lost the coverage argument under identical facts and issues. I do not agree. Under North Carolina law, collateral estoppel, or issue preclusion, is appropriate where (1) the issues in the current lawsuit are the same as those involved in the prior action; (2) the issues were raised and actually litigated in the prior action; (3) the issues were material and relevant to the disposition of the prior action; and (4) the determination of the issues in the prior action were

necessary and essential to the resulting judgment.[15]  *Bradley v. Hidden Valley Transp., Inc.*, 148 N.C. App. 163, 166-67, 557 S.E.2d 610, 613 (2001).  With respect to the first and second elements, the North Carolina Supreme Court has held that a court must closely examine matters actually litigated "to determine if the underlying issues are in fact identical," and "[i]f they are not identical, then the doctrine of collateral estoppel does not apply."  *Beckwith v. Llewellyn*, 326 N.C. 569, 574, 391 S.E.2d 189, 191 (1990).

I agree with National Union that Reichhold cannot establish the first and second requirements of collateral estoppel.  Here, among other differences, this action involves Reichhold's knowing failure to abide by contract specifications, whereas *ABT* involved defective siding arising out of negligent conduct.  In sum, collateral estoppel does not preclude National Union from litigating whether the defective resins in this case constituted an "occurrence" resulting in "property damage" within the meaning of the policies.

**CONCLUSION**

For the reasons stated above, it is **RECOMMENDED** that the motion for summary judgment by the insured Reichhold on Phase I (scope of coverage) issues (docket no. 276) be **DENIED** and that the motions for summary judgment by insurers

---

[15]  In a federal diversity action such as this one, the law of the state in which the district court sits determines issues of collateral estoppel.  *St. Paul Fire & Marine Ins. Co. v. Ivey*, 476 F.2d 583 (4th Cir. 1973).  In a diversity case involving an insurance policy issued in North Carolina, the law of North Carolina is controlling.  *Penn Re, Inc. v. Stonewall Ins. Co.*, 708 F. Supp. 123, 125 (E.D.N.C. 1988).

National Union, Gerling, IICNA and Westchester on Phase I issues all be **GRANTED** (docket no. 196, 197).  Furthermore, the motion for oral argument by all parties (docket no. 204) is **DENIED**.  National Union's motion to strike portions of Mark Callicutt's Affidavit (docket no. 211) is **GRANTED in part** and **DENIED in part**. National Union's motion to file a supplemental brief in response to Reichhold's motion for protective order is **DENIED** as moot (docket no. 219).  Because the court should grant summary judgment to the insurers in this matter and find no coverage, the summary judgment motions as to Phase II (limits of coverage) should all be **DENIED** as moot (docket nos. 224, 227, 229).

Finally, I note that in its Second Amended Complaint, National Union seeks a declaration regarding its right to reimbursement to settlement monies it paid in *Glasslam II.*  That issue, however, is not before the court on the parties' respective summary judgment motions.

WALLACE W. DIXON
United States Magistrate Judge

June 2, 2009

36